UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LANI KYLE MOAR,

      Plaintiff,                         Case No. 2:17-cv-10142

v.                                     HONORABLE STEPHEN J. MURPHY, III

CIGNA CORPORATION, et al.,

      Defendants.

_____/

**OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [33] AND
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [34]**

      Lani Moar alleged that she is totally disabled and filed claims under ERISA to challenge her insurers' final determinations that she does not qualify for benefits. Both sides have filed cross-motions for summary judgment and the Court held a hearing. For the reasons below, the Court will grant Plaintiff's motion and deny Defendants' motion.

**BACKGROUND**

I.   The United Airline Policies

      United Airlines (United) offers its flight attendants a bundle of benefits that they may choose to enroll in. In the case of insurance benefits, United purchases policies from insurance companies, explains the terms of the policies to its flight attendants, and gives them the opportunity to enroll if they wish. During the 1980s, United Airlines (United) secured two policies ("the Policies") relevant here: In 1980, Defendant Life Insurance Company of North America (LINA) issued United a Long-Term Disability Policy (LTD); in 1988, the Connecticut General Life Insurance Company (CGLIC) issued

United a group life insurance policy. Part of the life insurance policy includes a waiver of premium (WOP) benefit. When Plaintiff Lani Moar joined United in 1989, she enrolled in the Policies.

At the outset, the Court finds that while LINA and CGLIC—along with their policies—are distinct, they are both subsidiaries of Cigna. Accordingly, the letterhead, email addresses, and logos within the administrative record principally refer to Cigna. Most relevant correspondence from the two insurers are mirror images, though when applicable, LINA and CGLIC are identified as relevant underwriters and points of contact, and a recurring, fine-print footnote discloses that "[p]roducts and services are provided by these insurance company subsidiaries and not by CIGNA Corporation." *See, e.g.*, ECF 30-1, PgID 9212, 9216, 9223. At the hearing, however, both parties generally referred to Defendants collectively as Cigna and the records themselves sometimes blur the lines between the two entities. *See, e.g.*, ECF 30-1, PgID 9232 (the heading of a letter rejecting Moar's appeal refers solely to LINA and its policy, but functionally addresses the CGLIC policy and WOP benefits as well). For clarity, the Court will hew to the distinction between the two.

Both policies allow United employees like Moar to receive benefits if they become disabled. Under the LINA policy, an employee is initially considered "totally disabled" if an injury or illness renders her "unable to perform all the essential duties of [her] occupation." ECF 30-5, PgID 9742. After 24 months, however, the employee is considered totally disabled only if she is "unable to perform all the essential duties of *any occupation* for which [s]he is or may reasonably become qualified based on [her] education, training or experience." *Id.* (emphasis added). The CGLIC policy uses a

similar definition, but it does not distinguish between disability in one's field and disability from any occupation. Under the CGLIC policy, an employee has a "Permanent Total Disability" if an injury or sickness completely and continuously prevents her "from performing any work or from engaging in any occupation or employment for wage or profit for which [s]he is qualified, or may reasonably become qualified, based on [her] training, education or experience, and [s]he presumably will continue to be so disabled for the remainder of [her] life." ECF 24-13, PgID 4325 (filed under seal).

II. Moar's First Set of Appeals

During the 1990s, Moar developed lupus and congestive heart failure.[1] As a result of the conditions, she ceased working on December 27, 1999 and submitted claims of total disability under both Policies. ECF 30-1, PgID 9217. CGLIC and LINA approved the claims, so Moar's WOP benefits commenced on June 27, 2000 and her LTD benefits commenced on September 22, 2000. ECF 32-1, PgID 9210; ECF 30, PgID 9095 (noting an initial 270-day waiting period for LTD benefits). After the initial 24 months, Moar continued to receive LTD benefits.

From time to time, LINA and CGLIC would try to verify the extent of Moar's disability. When they did so, they drew from various sources. For instance, they would request medical records from her treating physicians, ask those physicians to complete forms and questionnaires, and in some cases have them verify the conclusions that LINA's and CGLIC's reviewers had reached. LINA and CGLIC would also ask Moar to fill out forms and questionnaires.

---

[1] In a letter to Cigna, she stated that she was diagnosed with the disease in 1991. ECF 30-1, PgID 9220.

In 2011, LINA and CGLIC began to investigate Moar's disability and asked Moar's primary care physician, Dr. Crandall, to fill out a Physical Ability Assessment—a checklist of common physical movements that allowed Crandall to explain what Moar was and was not capable of. In the assessment, Crandall reported that Moar could lift a maximum of two and a half pounds, could occasionally climb stairs but could perform no repetitive movements, and noted that Moar's foot control limited her to only occasional, short driving trips. ECF 24-2, PgID 1323 (under seal).

LINA sent the same assessment form to Moar's cardiologist, Dr. Bowers, but his conclusions were somewhat different. He concluded that Moar could lift ten pounds "constantly" or more than five and a half hours a day and that she could occasionally lift up to fifty pounds. ECF 24-2, PgID 1282 (under seal). Bowers believed Moar could sit constantly throughout the day and stand, non-consecutively, for five and a half hours a day. *Id.* at 1281. In his concluding notes, Bowers stated that Moar was, "stable from [a] cardiovascular standpoint" and that her limitations were "due mostly to medical issues." *Id.* at 1282.

LINA asked Dr. Thompson (Moar's neurologist) to fill out an assessment, too. He did not fill out the assessment, but instead sent a brief letter that detailed why he had performed surgery on Moar in the past and her neurological health to date. He concluded only that she was "quite stable neurologically and from an imaging standpoint." ECF 24-2, PgID 1279.

LINA contends that based on the inconsistencies of these reports, it commenced a clandestine surveillance of Moar. ECF 34, PgID 9839. Over the course of three days, investigators recorded her as she went about her daily routine, summarized what they

saw, and concluded that Moar was "capable of returning to work in a sedentary occupation." ECF 30-1, PgID 9213. LINA and CGLIC sent a copy of the DVD, along with their written conclusions, to Moar's doctors with a request: review the DVD and our report and if you do not agree with our conclusion, "submit medical documentation that would be contrary to these findings." *Id.*

Response from the doctors was limited. Dr. Crandall sent a letter explaining that she had "no additional clinical documentation beyond what had previously been provided." *Id.* Dr. Bowers sent a note from Moar's recent office visit that was limited in scope. Dr. Thompson sent nothing, but his office called to say that he "is not involved in [the] patients' disability status." *Id.* at 9214.

Based on the records before it, the surveillance it conducted, and Moar's doctors' responses, LINA sent Moar a letter dated February 10, 2012 and informed Moar that after completing its review of her claim, it was "unable to continue paying [LTD] benefits beyond February 9, 2012," though to "prevent financial hardship," benefits would be paid through March 10. *Id.* at 9212. CGLIC sent a similar letter a month later, on March 13, 2012. It stated that after a "review of your claim, we are unable to continue your claim for waiver of premium of life insurance coverage beyond February 16, 2012." *Id.* at 9216. Both letters summarized how the decisions were reached and upon what information they were based.

Moar appealed the decisions. Initially, she did so pro se and without supplementing the record. *Id.* at 9220–23, 9226. LINA and CGLIC[2] rejected the initial

---

[2] Although the letter refers only to LINA and the Life policy, the body of the letter mentions the WOP benefit, too. *See* ECF 30-1, PgID 9232; *see also* ECF 34, PgID

appeals on June 5, 2012, *id.* at 9232, and then Moar "re-appealed" the decisions, through counsel, *id.* at 9237, 9257. In the second effort, Moar submitted additional records and letters from doctors who had treated her: a rheumatologist, a neurologist, a cardiologist, a gastroenterologist, an ophthalmologist, and additional records from Dr. Crandall. *Id.* at 9237–38. LINA then retained two doctors to review the new materials and to state whether they agreed with Moar's physicians. The doctors were Dr. Fishman, a cardiologist, and Dr. Almaraz, a neurologist.

The two independently and thoroughly summarized Moar's medical history, but arrived at different conclusions in their respective disciplines. Fishman concluded "I have no disagreements with the claimant's physicians. The limitations and restrictions that are attributed to her various medical illnesses and diagnoses are severe and extremely limiting and lead to great restrictions and complete disability." *Id.* at 9254. Almaraz, on the other hand, concluded

> From a neurological point of view, I disagree with the attending providers' restrictions and limitations in this case. The only restriction that I see, from a neurological perspective, is that the claimant should [be] precluded from engaging in heavy labor category of work. Otherwise, I see no objective neurological basis to impose any restrictions or limitations.

ECF 24-3, PgID 2026. Almaraz conceded, however, that Moar's records "document a suspected autoimmune disorder and a cardiac condition, but these are outside of my area of expertise." *Id.*

With these reports in hand, along with the documents Moar submitted, LINA and CGLIC reversed their decisions and reinstated Moar's benefits. *Id.* at 9256, 9266.

---

9841 n.7 (explaining that "the letter clearly addresses both Plaintiff's LTD and WOP appeals").

III.   Moar's Second Set of Appeals

In 2015, a second process began. LINA sent Dr. Crandall another assessment form to complete, along with a medical request form. In that assessment, Crandall stated that Moar could stand, walk, or sit for one third of the day and could occasionally lift ten pounds, although she could "rarely" climb stairs. ECF 24-2, PgID 1118. Crandall also indicated[3] that, unlike before, Moar could not even occasionally use her lower extremities for foot control. *Id.* Yet in the portion of the medical request form that asked, "What are the specific restrictions that you have placed on your patient?" Crandall wrote "See previous form – no change." *Id.* at 1116. Crandall also noted that no accommodations would allow Moar to return to work in her current condition and in a portion that asked when Crandall thought Moar could return to work without restrictions, Crandall wrote, "never."[4] *Id.*

Still, in light of Dr. Crandall's new assessment, CGLIC[5] again denied Moar benefits through a letter dated September 4, 2015. ECF 30, PgID 9277. According to the letter, CGLIC requested current medical records from all of Moar's providers to "ensure a complete review of [her] Waiver of Premium claim," and "all information on file was considered." *Id.* The only records specifically mentioned, however, were office notes from Drs. Bowers and Crandall (both dated July 21, 2015) and the assessment and medical request forms that Crandall filled out. The denial letter explained that

---

[3] Crandall left the boxes for "Constantly," Frequently," and "Occasionally" unchecked, but did check the box did that confirmed her findings were supported by clinical findings.
[4] She left the box labeled "with restrictions" blank.
[5] The letter actually lists LINA as the insurer, but the body of the letter discusses WOP benefits, rather than the LTD benefits provided by LINA.

Crandall's assessment suggested Moar was capable of working as an "Information Clerk," and was therefore not totally disabled. *Id.* at 9278.

Moar appealed the determination through her attorney in January 2016. And she supplemented her file with documents from treating physicians who specialized in cardiology, urology, nephrology, rheumatology, and neurology. ECF 30-1, PgID 9288, 9292, 9294. The appeal letter also detailed Moar's medical history and suggested that the repeated denials were arbitrary and capricious, in violation of ERISA.

Moar's appeal prompted CGLIC to retain several doctors with different specialties to review Moar's case and render opinions:

- Dr. Pietruszka, who is board certified in occupational medicine, pathology, and forensic toxicology. *Id.* at 9296;
- Dr. Johnson, who is board certified in cardiovascular disease. *Id.* at 9303; and
- Dr. Warner, who is board certified in occupational and environmental medicine. *Id.* at 9312.

Their conclusions are further discussed below, but in sum, none concluded that Moar was totally disabled.

Accordingly, CGLIC affirmed its decision to deny further benefits on August 30, 2016, and rendered the decision final. ECF 30-2, PgID 9326. Moar filed the instant suit in state court thereafter and Defendants removed it on January 17, 2017.

While the case was underway, LINA sent Moar a letter on April 18, 2017. The letter explained that LINA no longer considered Moar eligible for LTD benefits beyond April 17, 2017, but to prevent financial hardship, benefits would continue through May 16, 2017. *Id.* at 9339. In the letter, LINA explained that it took into account the WOP denial, although it also reviewed Moar's complete file, including additional information she and her doctors submitted. *Id.* at 9340.

The April 2017 letter described how LINA reached its decision, but this time it was longer and more detailed. First, it discussed how it had retained Dr. Warner to review Moar's records and to perform an independent medical examination (IME) on her. The letter summarized Warner's conclusions as to the tasks Moar could perform. *Id.* Next, the letter summarized a questionnaire that Moar had filled out which explained the daily tasks she could and did perform. *Id.* Then the letter summarized what Moar's treating physicians had said about her capabilities. And finally, the letter stated that with all of the records in hand, LINA referred Moar's file to a rehabilitation counselor, who matched Moar's limitations to two jobs she could perform: a sedentary Reservations Agent and a sedentary Repair-Order Clerk. *Id.* at 9342. LINA concluded that because Moar could perform those jobs, she was not disabled.

Another appeal followed. Along with her appeal letter, Moar submitted additional records from her treating physicians. Specifically, she sent records from Bowers (the cardiologist), Eilender (the neurologist), Skender (the rheumatologist) and Crandall (the primary care doctor). ECF 30-2, PgID 9345–51. LINA referred the appeal to an occupational medicine doctor, who reviewed Moar's records and, along with Cigna's vocational rehabilitation department, concluded that Moar could work as a "Documentation Billing Clerk" or "Gate Agent" and thus was not disabled. ECF 30-2, PgID 9391–92. LINA's denial therefore became final on September 19, 2017, *id.* at 9390, and Moar accordingly then amended her complaint, ECF 15. The denial of both Moar's LTD benefits and her WOP benefits are now at issue in the case.

**STANDARD OF REVIEW**

The Court reviews a plan administrator's denial of ERISA benefits de novo "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). If there has been a clear grant of discretion to determine benefits or interpret the plan, then the Court looks only to whether the denial was arbitrary and capricious. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994).

**DISCUSSION**

I.   The Appropriate Standard of Review

The parties disagree over the standard of review. Moar contends that the Court should apply de novo review, while Defendants insist that the arbitrary and capricious standard is appropriate. The disagreement arises, in part, based on the differences between two documents: the Consolidated Welfare Benefit Plan ("the Plan") and the Summary Plan Description ("the Summary").

As its name suggests, the Plan consolidated several existing benefit plans for United employees and went into effect in 2012. ECF 30, PgID 8881. It has been amended from time to time since then. *See id.* at 8960–69. The Plan defines, among other things, benefit coverage, the process for enrollment and appeals, and the Plan's administrator. Each of the benefit programs that make up the Plan has its own separate "Program Document." The Plan defines these as:

> [T]he written materials setting forth the terms of each separate Benefit Program, which consist of all formally adopted and executed program documents. Insurance Company contracts or certificates, summary plan descriptions (including any summaries of material modifications),

enrollment materials, correspondence and other memoranda from the Company that describe in whole or in part a Participant's rights, benefits, limitations and obligations under a Benefit Program.

*Id.* at 8891. Sometimes the terms of a Separate Program Document differ from the Plan's terms. The Plan resolves potential conflicts in the following way:

Separate Program Documents which describe the specific benefits provided by each Benefit Program, the individuals covered by each Benefit Program, and the other terms and conditions of each Benefit Program, including any contract with an Insurance Company maintained in connection with a Benefit Program, as amended from time to time, shall be attached hereto and incorporated herein by this reference. The Plan supersedes and replaces any Program Document defining the terms of or describing a Benefit Program which is not incorporated and made part of the Plan. If the Benefit Program is insured and there is a conflict between the specific terms of a Program Document and the terms of the Plan, the Program Document shall control. For all other Benefit Programs, if there is a conflict between the specific terms of a Program Document and the terms of the Plan, the Plan shall control (unless contrary to applicable law), except that any terms exclusively applicable to a Benefit Program shall be set forth in the applicable Program Document.

*Id.* at 8881–82.

The Summary, on the other hand, merely explains the scope and nature of the benefits established by the Plan. Although the Summary itself goes into great detail, it includes the following proviso:

This handbook is designed to summarize each benefit covering eligible participants in the Welfare Benefit Plan as simply and understandably as possible. Each of the benefits described in this handbook is based on a legal document or contract. If this handbook and the Plan documents conflict, the official documents will govern your benefits under the Plan.

*Id.* at 8978.

Both the Plan and the Summary discuss who administers the Plan. Section 10.6 of the Plan states that, "The Plan Administrator has sole discretionary authority to grant or deny benefits under this Plan." *Id.* at 8940. And the Summary makes a similar statement: "The Plan Administrator has the final and binding authority to determine who

is eligible for the Plan, what benefits they are entitled to under the terms of the Plan, what the terms of the Plan mean, and any other claims under the Plan." *Id.* at 8988. But the Plan Administer can also delegate its authority and responsibilities to a Claims Administrator, and if it does so, "[a]ny reference to the Plan Administrator in this Section 10.6 shall mean the applicable Claims Administrator[.]" *Id.* at 8940.

CGLIC and LINA denied Moar's claims and she contends that they lacked the authority to do so. In support, she refers to a portion of the Summary that states that the "Administrator of the Plan is a committee appointed by United's Board of Directors called the Pension and Welfare Plans Administration Committee (PAWPAC)." *Id.* at 8982. She points out that PAWPAC did not deny her claims, but rather, Cigna (or LINA and CGLIC) did. Moar concludes that Cigna was not clearly granted sole discretion to deny her claim and thus de novo review should apply.

The Plan unambiguously grants discretion to determine benefits or interpret the plan to the Plan Administrator and permits the Administrator to delegate the authority to make claim decisions to a Claims Administrator. *Id.* at 8938–40. Section 10.6's clear grant of discretion extends to any delegated Claims Administrator because "[a]ny reference to the Plan Administrator in this Section 10.6 shall mean the applicable Claims Administrator[.]" *Id.* at 8940. Although the Summary identifies PAWPAC as the Plan Administrator, the copy of the Summary given to the Court is dated July 1993— some 19 years before Moar's relevant claim was denied. The Plan was issued in the interim and Moar's Amended Complaint flatly states that at all relevant times, CGLIC and LINA "under the service mark 'CIGNA Group Insurance'" were administrators of the Plan and fiduciaries of it "within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21)"

and both CGLIC and LINA acted as claims fiduciaries who administered claims for benefits under the Plan. ECF 17, PgID 189, ¶¶ 17–18. At the hearing, Moar's attorneys stated that PAWPAC is and was the Plan Administrator, but noted that it delegated claims-administrative authority to LINA and CGLIC.

Accordingly, the Plan clearly granted LINA and CGLIC the sole, discretionary authority to grant or deny benefits under the Plan. The Court must therefore review the denials under the arbitrary and capricious standard.

II.    The Denial of Benefits

In some respects, the case turns almost entirely on which doctors' opinions should be privileged. Moar argues that the medical records do not support Defendants' conclusions that she is not disabled. She contrasts the thorough records of her treating physicians to purportedly sparse considerations by Defendants' hired consultants whom, she alleges, lacked the necessary qualifications to determine the extent of her disability. Defendants counter that they gave due consideration to Moar's physician's opinions and aver that the denials "were the result of deliberate, principled reasoning processes and are supported by substantial evidence[.]" ECF 34, PgID 9833.

To begin, there is nothing amiss about insurers requiring a claimant to provide objective medical evidence of disability when the plan permits such requests. *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007). And an insurer may change a disability determination based on those records, even if the claimant has received benefits for a long time. *See Rabuck v. Hartford Life & Acc. Ins. Co.*, 522 F. Supp. 2d 844, 872 (W.D. Mich. 2007). But there must be a reason for the change:

> We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the

> previous payment of benefits is a circumstance that must weigh against
> the propriety of an insurer's decision to discontinue those payments.

*McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002). The Sixth

Circuit has said much the same thing. *See Morris v. Am. Elec. Power Long-Term*

*Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) ("Surely it is reasonable to require

a plan administrator who determines that a participant meets the definition of 'disabled,'

then reverses course and declares that same participant 'not disabled' to have a *reason*

for the change; to do otherwise would be the very definition of "arbitrary and

capricious."). Here, Cigna discontinued Moar's benefits after paying them for many

years, so the denials must therefore be viewed in that light.

In any event, because the Court is applying the arbitrary-and-capricious

standard, it must affirm the denial of Moar's benefits if those decisions were "the result

of a deliberate, principled reasoning process and . . . supported by substantial

evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd* 554 U.S. 105

(2008) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d

1140, 1144 (6th Cir. 1991)). The Court may overturn the denials "only upon a showing

of internal inconsistency, bad faith, or some similar ground." *Racknor v. First Allmerica*

*Fin. Life Ins. Co.*, 71 F. Supp. 2d 723, 729 (E.D. Mich. 1999) (citing *Davis v. Kentucky*

*Fin. Cos. Ret. Plan*, 887 F.2d 689, 695 (6th Cir. 1989)). The highly deferential standard,

however, is not a rubber stamp: courts are to give particular attention to arrangements

in which there is an evident conflict of interest—namely, when the entity that determines

which claims are covered is also the payor of those claims. *Calvert v. Firstar Fin., Inc.*,

409 F.3d 286, 292 (6th Cir. 2005). Nevertheless, if the plan administrator's decision is

"rational in light of the plan's provisions and reasonable with no abuse of discretion, then it must be upheld." *Racknor*, 71 F. Supp. 2d at 729.

The Court will therefore look to Cigna's denials with two particular details in mind; the first is that Cigna denied Moar's benefits after providing them for many years. That detail does not mean that the insurers bear a burden to prove that Moar is *not* disabled, but it does require a showing that something changed—be it new information, an inadequate response to a request, or something else. Defendants contend that it is "settled Sixth Circuit precedent" that the insured person bears the burden of providing proof that she is disabled, ECF 34, PgID 9857, but the Court considers that argument overstated: an insured person carries the burden when the Plan says she does. *See Calvert*, 409 F.3d at 289 (stating that the insured person "bears the burden of proving his or her continuing 'disability'" in the context of describing a plan's specific provisions). Although Defendants contend that the Plan imposed on Moar an ongoing burden to provide proof of her disability, the document they point to does not support that proposition. The cited portion of the document addresses only the commencement of benefits and does not speak to any continuing obligation of Moar. *See* ECF 30-5, PgID 9752. The succeeding portion addresses "Duration of Benefits" but states only that the insurance company will stop paying monthly benefits on "the date the Employee ceases to be Totally Disabled" or when she turns 65. *Id.*

Nevertheless, Moar was at least aware that some continuing proof was expected because when she first began receiving benefits, she received a letter from Cigna that stated, "We will request proof of continuing disability on an annual basis, which means

you need [to] be under the care of [a] licensed physician." ECF 30-1, PgID 9210. And when CGLIC affirmed her first appeal, it sent her a letter that stated:

> Future medical updates on your continuing disability status will be required on an annual or as needed basis. We will provide form(s) for you and your attending physician to complete and it is your responsibility to return them in a timely manner. The continuation of your coverage for Waiver of Premium will depend on this ongoing medical evaluation, as well as confirmation that you continue to satisfy all applicable contract provisions.

ECF 30-1, PgID 9267. There is no dispute that Moar submitted voluminous records and questionnaires over the course of her appeals, so the posture before the Court is whether Defendants arbitrarily or capriciously discontinued Moar's benefits in spite of those records.

The second detail for the Court to consider is Cigna's inherent conflict of interest. Cigna was both the determiner of benefits and the payor. Although the arrangement does not change the Court's standard of review, the conflict is a "relevant factor" in the Court's review. *See Glenn*, 461 F.3d at 666.

With those details in mind, the Court will review the two denials in turn.

A.     Denial of WOP Benefits

As noted above, CGLIC based its denial specifically on recent records from Drs. Bowers and Crandall. But when Moar appealed and submitted more documents, CGLIC retained three more doctors to review the case. CGLIC based its denial of the appeal on the reports of those doctors and so their conclusions are particularly germane to the Court's review of the WOP denial.

Of the three doctors, Dr. Warner was the only one to actually perform an in-person IME. Warner is board certified in occupational and environmental medicine and he specifically evaluated Moar's physical capabilities. Based on both Moar's records

16

and Warner's own measurements with a dynamometer, he concluded that Moar could frequently lift 10 pounds and could occasionally lift up to 50 pounds. ECF 30-1, PgID 9319. He further concluded that Moar could sit frequently, stand and walk occasionally, and "do fine manipulation and simple grasping constantly." *Id.* Importantly, however, Warner ended his observations with the following paragraph:

> Please note that environmental conditions may change her medical conditions and exacerbate her medical complaints. This would include Raynaud syndrome in cold weather, and her functional abilities would fluctuate based on the claimant's medical conditions and any exacerbation she may have with her pain. This major source of fluctuation would be based on her systemic lupus erythematosus.

*Id.*

Dr. Johnson only reviewed Moar's records and his conclusions were limited because his expertise is limited to cardiology. Indeed, he did not even consider seven of Moar's conditions in his analysis because they were outside of his expertise. *See id.* at 9301–02. Accordingly, when asked "Is the customer functionally limited and to what degree?" he answered "*From a cardiovascular standpoint,* I would opine that there is no evidence of impairment supported in the medical record[.]" Id. at 9302 (emphasis added). His only other conclusion was also cardiovascular-specific. The form asked, "[d]oes the customer require medically necessary work activity restrictions and if so describe the restrictions." *Id.* Johnson answered:

> There is no evidence presented to support a requirement for medically necessary work activity restrictions. The claimant has no evidence of myocardial ischemia, cardiac arrhythmia, and has had no hospitalization or treatment for congestive heart failure beyond diuretics therapy. She describes palpitations and tachycardia and is on beta blocker for this, but monitoring has been negative (3/2015). Cardiac restrictions and limitations are not supported.

*Id.* Although this answer did not begin with the same limiting phrase ("from a cardiovascular standpoint"), it nevertheless exclusively addressed cardiovascular health. In sum, Johnson's contribution was the narrow conclusion that Moar's cardiovascular health did not render her entirely disabled.

Dr. Pietruszka's conclusions were more definitive. He is board certified in occupational medicine, pathology, and forensic toxicology, though he attested that none of Moar's conditions was beyond his expertise. *Id.* at 9294–95. Initially, he reviewed only some lab results from October 2015 along with three chart notes written around that time.[6] *Id.* at 9294. From them, Pietruszka accurately pointed out that Moar's doctors had not found her to be cardiologically disabled. But he also arrived at the broader conclusion—based on the notes of Moar's last neurologist appointment—that "[n]o documentation or diagnostic testing has been presented to substantiate the necessity of disability" and that "the submitted documentation does not reflect any current labor limiting functional disability secondary musculoskeletal symptoms." *Id.* at 9295. The conclusion may not be surprising: no physical exam was performed during the office visit described in the notes and the reason Moar was seeing her neurologist was because of the severe migraines she had been suffering from, as well as cavernous

---

[6] Admittedly, the document begins with the statement,

> All available medical and/or vocational evidence bearing on Disability and/or functional capacity and its impact on the whole person has been considered in order to provide an accurate representation of the medical and/or vocational facts of the claim file.

ECF 30-1, PgID 9294. But that appears to be mere boilerplate language; Dr. Johnson's report begins with the same statement, verbatim. *Cf. id.* at 9299. Pietruszka only discussed the listed documents.

angiomas of the brain. *See id.*; *see also* ECF 24-4, PgID 2591–95 (the actual notes of the office visit, filed under seal).

In addition to the record review, Pietruszka placed a few phone calls to Moar's other doctors, though in all but one case he simply left messages with them. ECF 30-1, PgID 9295. He did manage to connect with Moar's rheumatologist, who informed Pietruszka that Moar was on medication for lupus and suffered from fibromyalgia. The rheumatologist, however, was unaware that Moar was functionally disabled and had no notes regarding disability. *Id.* Pietruszka did not elaborate further on the matter.

Thus, based on a handful of recent office visits, none of which involved physical diagnostic testing, Pietruszka reached a plain conclusion: Moar was neither functionally limited nor did she require necessary work restrictions because there was no "current objective evidence," "no specific test performed," and "no current evidence of customer's functional limitation." *Id.* After Pietruszka's review, however, he was soon presented with 82 more records, dating from 2000 to 2015. When asked whether any of this additional information changed his prior opinions, Pietruszka answered no. But his only explanation was a brief reference to Dr. Almaraz's 2013 report that he characterized as "disagree[ing] with the restrictions and limitations placed on [Moar.]" *Id.* at 9297–98. Pietruszka thus concluded that there was a "lack of indication, per the records, that [Moar] has functional deficits to support changing the previous determination." *Id.*

In sum, none of the reviewing doctors considered the debilitative scope of Moar's principal affliction: lupus. Johnson explicitly avoided opining on it because it was outside his expertise. Warner noted that the lupus would cause major fluctuations in Moar's

functional abilities, thus limiting the value of his conclusions. Pietruszka's sole reference to the condition stemmed from a phone call to Moar's rheumatologist who had no notes on Moar's disability. The lack of consideration for Moar's lupus suggests the denial was arbitrary.

CGLIC's denial was also capricious. Back in 2012, CGLIC commissioned and reviewed two reports: Dr. Almaraz's and Dr. Fishman's. The reports were commissioned for the same reason and written within days of each other. Based on them, CGLIC determined that Moar was indeed disabled. Yet years later, when CGLIC commissioned Pietruszka, his much shorter report made no mention or recognition of Fishman's report, yet relied in part on Almaraz's report. And that time CGLIC concluded that she was disabled after all. Notably, Almaraz's report was also narrowly limited to Moar's neurologic health and disclaimed the ability to opine on the effect her lupus had on her abilities. ECF 24-3, PgID 2026 (under seal). There was very little basis on which to justify CGLIC's new determination that Moar was not disabled.

All of those facts, paired with the CGLIC's inherent incentive to deny benefits, lead the Court to conclude that CGLIC's denial was arbitrary and capricious.

B.    Denial of LTD Benefits

When LINA denied Moar's LTD benefits and her subsequent appeal, it relied on the same record used in the WOP determination, with a few additions. The additions included more Physical Ability Assessments from Moar's treating physicians and reviews from two more occupational medicine doctors:  Dr. Jacobson (retained for the initial denial process) and Dr. Sethi (retained for the appeal). LINA did not commission another IME, but instead relied upon Dr. Warner's prior findings.

After reviewing the files, Jacobson did not agree with Moar's treating physicians regarding her limitations, in part because they contradicted one another. ECF 24-9, PgID 3735 (under seal). Their findings can be summarized as follows:

| | Crandall* | Eilender | Bowers | Skender |
|---|---|---|---|---|
| Sitting | Occasionally | Constantly | Occasionally | Constantly |
| Standing | Occasionally | Occasionally | Occasionally | Occasionally |
| Walking | Occasionally | Occasionally | Occasionally | Frequently |
| Reaching (High) | Never | Occasionally | Frequently | Frequently |
| Reaching (Low) | Never | Constantly | Frequently | Frequently |
| Simple Grasping | Occasionally | Constantly | N/A | Occasionally |
| Lifting | | | | |
| - 10 lbs. | Occasionally | Frequently | Frequently | Frequently |
| - 11-20 lbs. | Never | Frequently | Occasionally | Frequently |
| - 21-50 lbs. | Never | Never | Never | Occasionally |
| * Crandall was the only physician to affirm that her findings were supported by clinical findings | | | | |

ECF 24-3, PgID 1797; ECF 24-4, PgID 2481–82; 2385–86, 2392–93. In light of the contradictions, Jacobson deferred to Warner's IME and concluded that Moar was not disabled.

As explained above, however, Warner conceded that Moar's lupus would cause her symptoms and limitations to fluctuate. Thus, even though he performed clinical tests as to her physical abilities and concluded that she could perform certain tasks with regularity, his report did nothing to shake CGLIC's and LINA's prior determinations that she was functionally disabled.

When Dr. Sethi reviewed the files, he also concluded that Moar was not disabled. ECF 24-3, PgID 1567–82. But the foundations of his conclusions are tenuous. Sethi determined that the medical records of Dr. Saluja, a rheumatologist, were "sufficient to

indicate that [Moar] is quite medically functional and there are no examination findings to require any medically necessary restrictions" despite the fact that the most recent records Sethi had from Saluja were six years old. *Id.* at 1581. Sethi separately stated that "[b]ased on the February 23, 2017 evaluation by neurologist Dr. Lawrence Eilender I believe [Moar] is medically functionally stable and the medical record review does not support any functional impairment or medically necessary restrictions." *Id.* Sethi's review of Eilender's notes, however, seems to have been somewhat perfunctory. Although Sethi stated that as of February 2017, Moar's migraines were "stabilized and no further intervention was planned," ECF 24-3, PgID 1580, Eilender notes actually reveal that Moar was consistently suffering from headaches that lasted "around 4 days," that Eilender was still working with Moar in June 2017 to find a combination of medications that would work, and that Eilender planned to send her to a rheumatologist for further treatment, ECF 24-3, PgID 1677–78, 1680–81 (under seal).

LINA ultimately and finally denied Moar's LTD benefits on the basis of Jacobson's and Sethi's reports. Although each doctor's report includes a lengthy recitation of Moar's medical history and the records provided for review, the stated bases of the doctors' conclusions are very limited and rest on a few, select records. The doctors and LINA relied on a fraction of the relevant medical evidence and failed to acknowledge the fluctuations that Moar's lupus created. For those reasons, the denial was arbitrary and capricious.

III.   Remedies

For the foregoing reasons, the Court will grant Moar's motion and enter judgment in her favor. Moar seeks several forms of relief, namely: (1) a declaratory judgment that she is entitled to certain benefits, (2) permanent injunctions to keep Defendant from

limiting her benefits in the future, (3) a full accounting of her benefits, (4) payment of her past-due benefits, and (5) attorney fees and costs. ECF 33, PgID 9794. She is entitled only her past-due benefits and fees and costs.

ERISA creates the cause of action for improper benefit denials and lists the permissible types of relief a plaintiff may seek. In cases like this one, she may recover benefits due to her under the terms of the plan or enforce or clarify her rights under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). Moar relies on subsection (a)(3) to request injunctions, but that type of equitable relief is unavailable to plaintiffs who can be made whole by receiving their benefits, attorney's fees, and in some cases, prejudgment interest. *See Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 371 (6th Cir. 2015) (en banc). And Moar points to no section of the statute to support her request for an accounting.

Moar's requests for injunctions and a declaratory judgment fail for another reason: the Court's ruling does not confirm that Moar is or was disabled under the policies. Rather, the Court finds only that the decisions to deny Moar's benefits were arbitrarily and capriciously made. It may be that after further review, LINA and CGLIC lawfully conclude that Moar is no longer entitled to benefits under the Plan. Accordingly, neither an injunction nor a declaratory judgment would be an appropriate remedy, even if they were available under the statute.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Plaintiff's Motion for Summary Judgment [33] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [34] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants shall pay Plaintiff any past-due benefits and commence paying the quarterly waiver of premium benefit and the monthly LTD benefit.

**IT IS FURTHER ORDERED** that pursuant to 29 USC § 1132(g)(1), Plaintiff is entitled to an award of reasonable attorney fees and costs, upon timely motion.

**SO ORDERED**.

                                        s/Stephen J. Murphy, III
                                        STEPHEN J. MURPHY, III
                                        United States District Judge

Dated: June 8, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 8, 2018, by electronic and/or ordinary mail.

                                          s/David P. Parker
                                        Case Manager